FILED'10 OCT 26 10:55USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

LARRY BRADFORD,

                    Petitioner,

        v.

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration,

                 Respondent.

Civil No. 09-6062-CL

**REPORT AND RECOMMENDATION**

CLARKE, Magistrate Judge.

Petitioner Larry Bradford brings this action pursuant to section 205(g) of the Social Security Act, as amended (Act), 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the Commissioner's final decision denying petitioner's application for disability insurance benefits. For the reasons set forth below, the decision of the Commissioner should be reversed and remanded for further administrative proceedings.

## PROCEDURAL POSTURE

Petitioner applied for disability insurance benefits June 29, 2006, alleging disability commencing October 1, 2000. (Tr. 76). His application was denied initially on August 8, 2006,

Page 1 - REPORT AND RECOMMENDATION

and again upon reconsideration on December 21, 2006.  (Tr. 54, 60).  Petitioner requested a

hearing, which was held by video conference before an Administrative Law Judge ("ALJ") on

April 18, 2008.  (Tr. 12).  Petitioner, represented by Counsel, appeared and testified, as did a

vocational expert.  No other witnesses submitted testimony.  On May 29, 2008, the ALJ rendered

an adverse decision.  (Tr. 9-19).  On December 19,  2008, the Appeals Council denied

Petitioner's request for review. (Tr. 1-3).

At the time of the hearing and the ALJ's decision, petitioner was 59 years old.  Petitioner

has a high school diploma and at least one if not two years of study at junior college.  (Tr. 25;

190, 192).  He has relevant past work experience as a pipe fitter, maintenance mechanic,

warehouseman/driver, and general laborer.  (Tr. 107).  Petitioner alleges disability beginning

October 1, 2000, due to Post Traumatic Stress Disorder ("PTSD") and diabetes mellitus.

## BACKGROUND

Petitioner is the son of an ironworker and a housewife, one of six children in what was by

his account a well adjusted household.  (Tr. 190).  Born in California, he was raised there and

graduated high school with average grades, a few close friends, and some extracurricular

activities, and no significant run ins with the law besides a couple of citations for joyriding.  (Tr.

190-191).  Petitioner enrolled at Merritt Junior College where he completed one year of study,

possibly two.[1]  (Tr. 192, 106, 25).

Petitioner was drafted into the Army on April 2, 1969, and assigned to an airborne

delivery unit in Germany, Nahbollenbach Army Depot, on November 15, 1969, where he worked

---

[1]The Administrative Record is inconsistent as to whether petitioner completed one year or
two.

as a supply clerk.[2]  (Tr. 191).  While in the service, petitioner received the National Defense

Service Medal and qualified as a sharpshooter.  (Tr. 192).  However, while stationed in Germany,

petitioner alleges that his commanding officer, Sergeant Webb, ran over his foot with a forklift in

what petitioner believed was an attempt on his life, and in a second attack beat him severely

about the head and upper body and pushed him down a flight of stairs.  (Id.).  Petitioner's military

medical records indicate he was treated for contusions on his left foot after it was run over by a

forklift on July 21, 1970.  (Tr. 189).  Petitioner provided a copy of a record, which was not found

in his military file, showing he was treated on September 17, 1970, for contusions of his right

upper eyelid and red areas on his right neck, both shoulders, his chest and back, and was

conscious but complaining of headaches.  (Id.).  Petitioner asserts Sergeant Webb was angry

because petitioner "went over his head" to get extended leave to be with his stepson, who was

suffering from and eventually died of kidney failure while petitioner was in the service.  (Tr.

190).

      Sometime thereafter petitioner received a summary court martial as a result of going

AWOL three times and breaking arrest on another instance.  (Tr. 190).  Although his military

records were uniformly positive prior to his transfer to Germany, (Tr. 191), at the time of his

special court martial his superiors described him as apathetic, requiring constant supervision, and

having a bad attitude, and unanimously recommended he be discharged for the good of the

service.  (Tr. 190).  In 1970, petitioner was sent to see Captain Barry N. Silberg, who did a

psychiatric evaluation and diagnosed petitioner as suffering from passive-aggressive personality

---

[2]Petitioner's military records are not part of the record in this case.  The summary here
reflects the facts as noted by Dr. Gerald D. Otis in his first evaluation of petitioner April 29,
2004.

disorder. (Id.). Also in 1970, petitioner underwent non-diagnostic glucose tolerance tests, which yielded results consistent with a precursor to diabetes mellitus and sufficient to diagnose renal glycosyria. (Tr. 187). Petitioner was discharged Under Honorable Conditions on November 29, 1970. (Tr. 191).

Petitioner returned to California following his discharge from the Army. Although petitioner married in December 1969, the marital relationship ended for all intents and purposes with the death of his stepson, and petitioner lived separately from his wife until their divorce in 1978. (Tr. 192, 77). The exact nature of petitioner's employment upon his return is unclear. His FICA records show a total yearly income of $340.86 in 1972. (Tr. 94). From 1973 to 1977, petitioner's yearly income varied from a low of $4,429.93 to a high $8,787.43. (Id.). In 1978, petitioner began work at Whitney Research in what was to be his longest continuous period of employment, apparently as a pipe fitter and maintenance mechanic. (Tr. 112-115, 192). In 1982, petitioner achieved his highest yearly income at $22,866.89. (Tr. 94). Petitioner married for the second time in December 1980. (Tr. 77). In 1981, petitioner was hospitalized at Pearl Hill Hospital in Oakland, California, for cut tendons in his hands, reportedly as a result of broken glass in a window falling on him. (Tr. 189). At some point in the late 1970s or mid-1980s, petitioner was hospitalized at Pacific Presbyterian Hospital in San Francisco, California, where he had surgery for a detached retina.[3] Petitioner and his second wife had a son, but the marriage ended in divorce in December 1983. (Tr. 77, 192).

---

[3]The record is entirely inconsistent with respect to the date for petitioner's surgery. There are references to the surgery taking place in 1976 (Tr. 295), 1980, (Tr. 189), 1983, (Tr. 570, 103-104), and 1984 (Tr. 295). The medical records from the actual surgery are not included in the Administrative Record.

Page 4 - REPORT AND RECOMMENDATION

In the years that followed, petitioner's mental and physical condition deteriorated.  From 1984 to 1997, petitioner's yearly income varied from a high of $5,658.88 to a low of $156.00.  (Tr. 94).  In 1987, 1992, 1993, 1994, 1999, and 2001 petitioner had no reported income at all.  (Id.).  During this time, petitioner struggled with joblessness, homelessness, alcohol and cocaine abuse, and began to struggle with PTSD symptoms.  (Tr. 101, 189).  In 1990, petitioner was diagnosed with diabetes.[4]  (Tr. 186).  Also in 1990, petitioner went through an alcohol treatment program provided through a Homeless Veterans Program at the United States Department of Veterans Affairs ("VA") Medical Center in Menlo Park, California ("Menlo Park VAMC").  (Tr. 189).  From 1992 to 2002, his employment consisted mainly of general labor through temporary labor agencies, (Tr. 95-96), with the exception that in 1998, petitioner was hired as a maintenance mechanic for Dexter Aerospace and achieved his first significant income in years at $23,917.60.  (Tr. 94, 96, 192).  Petitioner married for the third and final time in January 1999, but that marriage also ended in divorce in December 2000.  (Tr. 77, 192).

In June of 1999, petitioner saw Billy McDonald, Nurse Practitioner ("NP"), complaining that he was feeling weak, tired, thirsty, and was urinating frequently.  (Tr. 573).  When tests revealed that petitioner's blood sugar was 416, NP McDonald diagnosed him with "out of control" diabetes, gave him a shot of insulin, increased his Tolinase prescription dosage, and told him to return two days later.  (Id.).  When petitioner returned June 16, 1999, he reported feeling much better and was given a One Touch meter to monitor his blood sugar and a prescription for increased dosage of Tolinase.  (Tr. 572).  On July 13, 1999, petitioner saw Dr. Shenoy, reporting

_____

[4]The medical records of the original diagnosis are not a part of the Administrative Record.  This date is extracted from petitioner's medical records at the U.S. Department of Veterans Affairs Southern Oregon Rehabilitation Center & Clinic in White City, Oregon.

Page 5 - REPORT AND RECOMMENDATION

he had been unable to work since June 28 due to dizziness and problems with his vision, which were problematic because he did most of his work at significant heights. (Tr. 574). Dr. Shenoy noted petitioner's previous visit to NP McDonald and theorized petitioner's vision problems might be related to his diabetes and, in particular, his blood sugar. (Id.). Dr. Shenoy referred petitioner to an eye doctor for the problems with his vision and depth perception and set a follow up appointment with NP McDonald. (Tr. 577).

Petitioner saw Dr. D. Gritz, who found evidence of significant retinal breaks and old scars related to petitioner's prior surgery to repair his detached retina, noted "no return of vision" following that surgery, and petitioner's normal diabetic screen in October 1998. (Tr. 570). Dr. Gritz concluded that petitioner did not have an acute problem or diabetic retinopathy, but rather his loss of depth perception resulted from the detached retina and subsequent surgery. (Tr. 577). Dr. Gritz further noted that petitioner did not have Kaiser optometry benefits. (Id.).

Petitioner saw Dr. Shenoy again on July 19, 1999, reporting blood sugar of 148 that morning and persistent dizziness. (Tr. 575). On August 12, 1999, petitioner saw NP McDonald, who noted that petitioner's blood sugar was consistently in the 200s despite the Tolinase prescription. (Tr. 578). NP McDonald prescribed Glucophage in addition to the Tolinase, and recommended a psychiatric evaluation, noting that petitioner was worried, feeling down, and possibly depressed. (Id.). On September 23, 1999, petitioner saw Dr. Shenoy again, reporting episodic dizziness and blood sugar soaring to the 300 range despite taking both Tolinase and Glucophage. (Tr. 579). Dr. Shenoy found petitioner's diabetes was "not well controlled" and that he still had not returned to work because of concerns about working at heights while dizzy, but reached no objective conclusion regarding the cause of his dizziness. (Id.).

Page 6 - REPORT AND RECOMMENDATION

On October 21, 1999, petitioner enrolled in a diabetes management program. (Tr. 581). On November 4, 1999, petitioner again saw NP McDonald, complaining of tiredness, impotence, persistent fear, continued high blood sugar, and dysuria due to the Glucophage. (Tr. 580). NP McDonald switched petitioner from Glucophage to Rezulin and continued the Tolinase prescription. (Id.). On November 15, 1999, petitioner saw Ciardiello,[5] Registered Nurse ("RN"), in conjunction with his diabetes management plan, who advised petitioner he was already at the maximum recommended dosage of Tolinase and informed him that he should expect to switch to insulin if his blood sugar did not improve with the Rezulin prescription. (Tr. 581-82). On November 30, 1999, NP McDonald advised petitioner that the switch to insulin was necessary due to his uncontrolled blood sugar, which was running in the 300 to 400 range despite the Rezulin. (Tr. 584). Petitioner saw RN Ciardiello again on December 2, 1999, who noted his reluctance to start taking insulin and his determination to manage his blood sugar by oral medication, diet, and exercise. (Tr. 585).

Following a brief hospitalization on December 4, 1999, for pleuritic chest pains, (Tr. 587-591, 593), petitioner saw NP McDonald on December 7 for instruction on insulin injection technique. (Tr. 586). When petitioner saw RN Ciardiello again on December 16, 1999, who noted petitioner had "finally" switched to insulin as of December 9, and recommended an increase in his morning dosage. (Tr. 592). On January 7, 2000, petitioner saw Dr. Shenoy, who noted that petitioner continued to complain of dizziness despite his switch to insulin and restricted him from working at high altitudes. (Tr. 594). On June 1, 2000, petitioner saw Dr. Shenoy again for complaints of dizziness and sensitivity to light. (Tr. 599). Dr. Shenoy

---

[5]No first name is given for Nurse Ciardiello on the document.

restricted petitioner from driving when it was very sunny, and noted that petitioner may need to look for an alternate job if his work involved being outside. (Id.). Petitioner was last treated at Kaiser Permanente on August 24, 2000, for complaints of pain and numbness in his left arm and shoulder, (Tr. 602-605), and last seen by Dr. Shenoy when he requested his medical records be transferred to the VA, (Tr. 606).

Between 1990 and 2001, petitioner received medical care at the VA Palo Alto Health Care System ("Palo Alto HCS"), the San Francisco VA Medical Center ("San Francisco VAMC"), and the VA Northern California Health Care System ("VA NCHCS"). (Tr. 162, 257, 479).[6] On October 2, 2001, petitioner saw Dr. Andrew S. Westfall, House Officer in Ophthalmology, who diagnosed petitioner with a possible level of functional loss and referred him for a neuro-opthamology evaluation. (Tr. 305). Follow up notes dated January 14, 2002, show that evaluation resulted in a diagnosis of functional visual loss attributed to fluctuations in his blood sugar. (Tr. 303-304). Petitioner continued to receive treatment for "poorly controlled diabetes" throughout 2005 and 2006. (Tr. 162, 360, 399).

Some time between 1990 and 2003, petitioner was diagnosed by Ada Suzuki, RN, NP, as suffering from PTSD and alcohol and cocaine dependence of a 20 year duration, while receiving outpatient treatment at the VA Medical Center in Martinez, California ("Martinez VAMC"), a VA NCHCS outpatient clinic.[7] (Tr. 189). In 2001, petitioner was an inpatient at the VA

---

[6]Petitioner's records indicate he was last treated at Palo Alto HCS on May 21, 1991, at San Francisco VAMC on July 17, 2001; and at VA NCHCS on August 20, 2001. The full records of his treatment at those facilities are not included in the Administrative Record.

[7]All information regarding petitioner's treatment at the Martinez VAMC is drawn from Dr. Otis's April 29, 2004, report, Tr. 189-197. Dr. Otis' report does not provide the date of NP Suzuki's diagnosis of petitioner at Tr. 189. He references test results dated August 3, 2001, at Tr.

Southern Oregon Rehabilitation Center & Clinic in White City, Oregon, ("VA SORCC") for approximately one year, starting July 6, 2001, and continued to receive outpatient care thereafter. (Id.). Petitioner's medical records reflect mental health admissions in both 2002 and 2004 for depression, PTSD, psychosis, alcohol dependence, and past cocaine use. (Tr. 39). Petitioner's records also reflect problems of blindness in one eye and low vision in the other in July 6, 2001; diabetic retinopathy September 4, 2001; and of depression, psychotic disorder, and depressive disorder in 2002.[8] (Tr. 163-164). On February 26, 2003, petitioner was diagnosed by Cynthia Miller, Psychiatric Mental Health Nurse Practitioner ("PMHNP"), as suffering from PTSD, psychosis, and major depression. (Id.).

On April 29, 2004, petitioner was diagnosed by Dr. Gerald D. Otis, PhD, with chronic PTSD, psychotic disorder, alcohol and cocaine dependence, and schizotypal personality disorder. (Tr. 189-197). Dr. Otis interviewed petitioner for three hours, conducted a mental status examination, and interpreted psychological tests administered by the Psychology Service at the VA. (Tr. 198). He noted that petitioner's psychometric test results were "essentially identical" with the test results obtained August 3, 2001.[9] (Tr. 196). Dr. Otis observed that petitioner produced a 4-7-8 profile on the Minnesota Multiphasic Personality Inventory Scale 2 ("MMPI-2"), similar to the 2-7-3-8 profile produced in 2001, and noted that both suggested some

_____

196, but does not identify who administered that test. *See* FN. 8.

[8]These notations are part of a list of 26 "problems" identified on petitioner's VISTA Electronic Medical Documentation, printed at White City VAMC on July 13, 2006, Tr. 162-256. However, the narrative comments regarding petitioner's treatment and diagnoses cover only treatments between July 14, 2004, and July 10, 2006. As a result the exact nature of petitioner's condition, diagnoses, and treatment in 2001 and 2002 is ambiguous.

[9]Dr. Otis does not identify who conducted the August 3, 2001, testing.

Page 9 - REPORT AND RECOMMENDATION

psychotic thinking.  (Id.).  Dr. Otis recorded that petitioner's clinical scales were all elevated

between a T score of 76 and a T score of 95, indicating high levels of anxiety (T = 90),

depression (T = 78), bizarre mentation (T = 88), high discomfort levels around other (SOD T =

76), and behaviors or attitudes likely to contribute to poor work performance (WRK T = 79).

(Id.).  Petitioner's Global Assessment of Functioning ("GAF") score was 40, (id.), which

correlates to "some impairment in reality testing or communication OR major impairment in

several areas, such as work or school, family relations, judgment, thinking, or mood."  American

Psychiatric Ass'n., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed.,

text rev., 2000) ("DSM-IV-TR").

Dr. Otis noted that petitioner was "cooperative and did not appear guarded, evasive,

irritable, or hostile," although he was "somewhat withdrawn," and concluded that petitioner is of

"less than average intelligence, accompanied by problems with short-term memory and

maintaining concentration." (Tr. 193).  Dr. Otis noted that petitioner complained of episodic

depression, which was one of the reasons he sought treatment at Menlo Park VAMC, and

worsening anxiety as a result of his physical deterioration due to diabetes. (Tr. 194).  Dr. Otis

concluded by finding that petitioner met the exposure, re-experiencing, avoidance, and arousal

criteria for a diagnosis of PTSD, and found that his condition was chronic. (Tr. 194-196).  Dr.

Otis also noted that while petitioner's claim regarding the beating by Sergeant Webb could not be

substantiated, his PTSD appeared to be largely due to harassment and physical abuse which

petitioner believed occurred while he was stationed in Germany. (Tr. 197).  Following Dr. Otis's

evaluation, petitioner was treated on an inpatient basis for PTSD at the VA Puget Sound

Healthcare System ("Puget Sound HCS"), American Lake Division, in Tacoma, Washington

Page 10 - REPORT AND RECOMMENDATION

("American Lake VAMC") from August 30, 2004, to October 26, 2004. (Tr. 181). His GAF score on admission was 45. (Tr. 181). He continued to receive outpatient care at VA SORCC from Cynthia Miller, PMHNP, and Dr. William B. Allen, (Tr. 162-180).

Dr. Otis evaluated petitioner again December 29, 2004, and diagnosed him with chronic PTSD, recurrent severe major depressive disorder with psychotic features, alcohol and cocaine dependence, and schizotypal personality disorder. (Tr. 181-188). In a 90-minute examination, Dr. Otis recorded that petitioner did not appear defensive, guarded, evasive, hostile, demanding, or complaining. (Tr. 183). Dr. Otis found that petitioner's behavioral symptoms and emotional states appeared unchanged, but he appeared to have greater problems with short-term memory and concentration than he had on his previous examination. (Tr. 186). Dr. Otis noted that petitioner had previously been found to meet the stressor criterion for a diagnosis of PTSD, and continued to meet the re-experiencing, avoidance, and increased arousal criteria. (Tr. 185). On ten evaluations conducted between July 28, 2004, and June 16, 2006, petitioner's GAF score has been determined to be 40 on nine occasions, and 42 on one occasion. (Tr. 180). Petitioner is currently receiving service connected disability benefits from the Veterans Administration for his PTSD, and has been given a disability rating of 70 percent. (Tr. 39).

Dr. Otis also noted in his December 29, 2004, report that petitioner's medical problems included diabetic retinopathy, diabetic neuropathies in his feet, hypertension, hyperlipidemia, and atherosclerotic vascular disease. (Tr. 181). Dr. Robert C. Gerber, who treated petitoner June 7, 2004, for alopecia related to Agent Orange exposure while stationed in Germany, also noted that petitioner had a history of neuropathy and severe retinopathy secondary to his diabetes. (Tr. 186). Dr. Gerber further noted that petitioner had "painful feet" which a podiatrist had diagnosed

Page 11 - REPORT AND RECOMMENDATION

as peripheral neuropathy, but did not state either the date of the diagnosis or the treating

podiatrist's name. (Tr. 187). He further noted significant retinopathy in petitioner's left eye

including hemorrhage and neovascularization resulting in vision worse than 20/200 in the left

eye, but again did not state the date of diagnosis. (Id.). Dr. Gerber concluded that petitioner's

diabetes was "life altering and sight threatening." (Tr. 188).

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's

decision to deny benefits. The decision will be disturbed only if it is not supported by substantial

evidence, or if it is based upon the application of improper legal standards. Moncada v. Chater,

60 F.3d 521, 523 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir.

1989)). In this context, the term "substantial evidence" means more than a mere scintilla, but less

than a preponderance--it is such relevant evidence that a reasonable mind might accept as

adequate to support the conclusion." Id.; see also Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th

Cir. 1992). When determining whether substantial evidence exists to support the

Commissioner's decision, the court examines the administrative record as a whole, considering

adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879

F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible of more than one rational

interpretation, the court must defer to the Commissioner's conclusion. Moncada, 60 F.2d at 523.

## COMMISSIONER'S DECISION

The initial burden of proof rests upon the claimant to establish disability. Howard v.

Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, a claimant must demonstrate

an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A five-step sequential process is used to determine whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987); Lester v. Chater, 81 F.3d 821, 828 n. 5 (9th Cir. 1995, *as amended* April 9, 1996).

## A. THE FIVE STEP EVALUATION PROCESS

In the first step, the Commissioner determines whether a claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Lester, 81 F.3d at 828 n. 5; 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not currently engaged in substantial gainful activity, the inquiry moved to the second step.

In the second step, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii). If the Commissioner finds in the negative, the claimant is deemed not disabled. Lester, 81 F.3d at 828 n. 5; 20 C.F.R. §§ 404.1520(c), 416.920(c). If the Commissioner finds a severe impairment or combination thereof, the inquiry moves to the third step.

In the third step, the Commissioner must determine whether the claimant's impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1. If so, disability is conclusively presumed and benefits are awarded. Lester, 81 F.3d at 828 n. 5; *see* 20 C.F.R. §§ 404.1520(d), 416.920(d) If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the inquiry proceeds to the fourth step.

In the fourth step, the Commissioner determines whether the claimant can still perform

Page 13 - REPORT AND RECOMMENDATION

his "past relevant work." The Commissioner must first identify the claimant's residual functional capacity ("RFC"), which should reflect the individual's maximum remaining ability to perform sustained work activities in an ordinary work setting for eight hours a day, five days a week. Social Security Ruling ("SSR") 96-8p. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical and nonmedical facts. Id. The RFC is based on all relevant evidence in the case record, including the treating physician's medical opinions about what an individual can still do despite impairments. Id. If the claimant has sufficient "residual functional capacity" to perform his past work, he is not disabled and the claim is denied. If the claimant meets this burden, a prima facie case of disability is established and the inquiry advances to step five. Lester, 81 F.3d at 828 n. 5; 20 C.F.R. §§ 404.1520(e), 416.920(e).

In the fifth and final step, the burden shifts to the Commissioner to establish that the claimant is capable of performing other work that exists in the national economy. Lester, 81 F.3d at 828 n. 5; 20 C.F.R. §§ 404.1520(f), 416.920(f). If the Commissioner fails to meet this burden, the claimant is deemed disabled.

## B. THE ALJ'S APPLICATION OF THE FIVE STEP PROCESS

In the present case, the ALJ found that petitioner had not engaged in substantial gainful activity during the period of time between October 1, 2000 (the alleged onset date of disability), and December 31, 2000 (the date the ALJ determined Petitioner was last insured for Disability Insurance Benefits). (Tr. 14.).

At the second step, the ALJ found that a lack of objectively verifiable medical evidence precluded a finding that petitioner suffered from PTSD prior to the date last insured, and further

Page 14 - REPORT AND RECOMMENDATION

found that while petitioner's diabetes was a medically determinable impairment, there was insufficient medical evidence to support a finding that this impairment was "severe" prior to the date last insured. (Tr. 16). Therefore the ALJ concluded that petitioner had only one medically determinable impairment prior to the date last insured, and that this impairment "did not significantly limit [petitioner's] ability to perform basic work activities." (Id.). Thus at step two of the five-step evaluation, the ALJ found that petitioner was not disabled.

However, the ALJ continued on, loosely following the five-step analysis. The ALJ found that after the date last insured, petitioner's condition deteriorated and his "symptoms increased, such that they would have interfered with [petitioner's] ability to perform basic work activities, meeting the definition of severe." (Id.) Specifically, the ALJ found that petitioner required insulin to control his diabetes, developed peripheral neuropathy, foot ulcers, and diabetic retinopathy. (Id.) Furthermore, the ALJ found that petitioner "develop[ed] severe mental impairments," citing petitioner's evaluation for and diagnosis of PTSD, depression, schizotypal personality disorder, and alcohol and cocaine dependence. (Tr. 17).

The ALJ continued, concluding that while petitioner's symptoms did become severe, there was no evidence that petitioner experienced neuropathy, acidosis, or retinitis proliferans to the extent necessary to meet or medically equal Listing 9.08 prior to the date last insured, nor was there evidence that petitioner's peripheral neuropathy had resulted in significant and persistent disorganization of motor function in two extremities after the alleged onset date. Furthermore, the ALJ stated that even if petitioner's mental impairments were present prior to the date last insured, there was no evidence that they would meet or medically equal the severity of any mental listing in Listing 12.00.

Page 15 - REPORT AND RECOMMENDATION

Finally, the ALJ concluded that petitioner would have been unable to perform past relevant work if his symptoms, as described at the time of the hearing, existed at that level prior to the date last insured, citing testimony by the vocational expert that the job of pipe fitter is a skilled job with a specific vocational preparation level of seven that requires heavy level exertional activities. (Tr. 18). In conclusion, the ALJ found that petitioner would have been capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (Tr. 19). In so concluding, the ALJ cited the vocational expert's testimony that such jobs existed, assuming, without actually finding, that petitioner had the residual functional capacity to perform medium range work, yet was limited by the symptoms he developed following the date last insured. (Id.). Accordingly, the ALJ determined that petitioner is not disabled.

## DISCUSSION

Petitioner contends that the ALJ improperly terminated the disability analysis at step two of the sequential analysis because he erred in (1) failing to consult a medical expert to determine the onset date for petitioner's mental impairments; (2) improperly rejecting petitioner's mental impairments as non-severe; (3) failing to consider the combination of petitioner's physical and mental complaints in rejecting the severity of his impairments; and (4) crediting the opinion of three non-examining physicians (Drs. Mary Ann Westfall, Paul Rethinger, and Frank Lahman) over the opinion of petitioner's treating physician (Dr. William Allen). The court addresses each of these contentions in order according to the five-step sequential analysis.

## A. THE ALJ COMMITTED REVERSIBLE ERROR AT STEP TWO OF THE SEQUENTIAL ANALYSIS

Page 16 - REPORT AND RECOMMENDATION

At step two, a claimant must establish both that he suffers from a medically determinable physical or mental impairment, and that the impairment is severe. 42 U.S.C. § 423(d); Social Security Ruling ("SSR") 96-4p *available at* 1996 WL 374187 (July 2, 1996).[10]  If the claimant proves that he has a severe impairment or combination thereof, the ALJ must proceed to the third step of the sequential evaluation.

## I. PETITIONER'S MEDICALLY DETERMINABLE IMPAIRMENTS

To be "medically determinable," an impairment must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques.  Ukolov v. Barnhart, 420 F.3d 1002, 1004-5 (9th Cir. 2005); *see also* SSR 96-4p at *1 (distinguishing between symptoms, "an individual's own perception or description of the impact of his or her physical or mental impairment(s)," and signs,"an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques," and clarifying that although the regulations describe medical evidence as consisting of signs, symptoms, and laboratory findings, the existence of an impairment may not be established on the basis of symptoms alone); 20 C.F.R. §§ 404.1508, 404.1528(a)-(b), 416.908, 416.928(a)-(b).

### a. PTSD AS A CLINICALLY RECOGNIZED DIAGNOSIS

Because of the facts in this case, it is important to first note that post traumatic stress disorder as a diagnosed condition did not exist before 1980.  Termed "shell shock" during World

---

[10]Social Security rulings are binding on the Administration.  *See* Terry v. Sullivan, 903 F.2d 1273, 1275 n. 1 (9th Cir. 1990).  Such rulings reflect the official interpretation of the Social Security Administration and are entitled to some deference as long as they are consistent with the Social Security Act and regulations.  Massachi v. Astrue, 486 F.3d 1149, 1152 n. 6 (9th Cir. 2007).

War I and "battle fatigue" during World War II, posttraumatic illnesses were commonly diagnosed as "character disorders" and "resolved" through administrative discharges during the Vietnam War.  Jim Goodwin, Psy.D., *The Etiology of Combat-Related Post-Traumatic Stress Disorder*, in POST-TRAUMATIC STRESS DISORDERS: A HANDBOOK FOR CLINICIANS 1-18 (Tom Williams ed., 1987), *available at* http://home.earthlink.net/~dougyelmen/readjust.html.  It was not until after the Vietnam War that the federal government undertook its first intensive research study of posttraumatic illnesses, which eventually led in 1980 to the official diagnostic classification of PTSD and codification by the American Psychiatric Association in its Diagnostic and Statistical Manual of Mental Disorders, 3rd edition ("DSM-III").  *See* Nicholas J. Motherway, Post-Traumatic Stress, 49 Am. Jur. Proof of Facts 2d 73, § 2 (West 2005); Bell v. Cone, 535 U.S. 685, 705 n. 1 (2002) (*citing* DSM-IV at 463-68).  Therefore it is literally impossible that petitioner could have been diagnosed with PTSD until ten years *after* the traumatic event causing his disorder occurred.  *See, e.g.*, Henry v. Industrial Comm., 754 P.2d 1342, 1345 (Ariz. 1988) (en banc) (policeman traumatized on the job in 1960 applied for workers compensation 24 years later in 1984; refusing "to hold a claimant to the knowledge that his job [had] caused a serious medical condition based on post-traumatic stress syndrome when the condition was not diagnosable at the time he first sought treatment").

Furthermore, PTSD is intangible in nature.  Petitioner's injury is to his mind, manifesting itself primarily in behavioral ways, such that the diagnosis of the impairment necessarily relies more heavily on the opinion of the treating physician than it would if his injury were instead physical and subject to more tangible measurements.  PTSD is a severe anxiety disorder that can develop after an extreme traumatic event that causes psychological trauma.  A diagnosis of PTSD

Page 18 - REPORT AND RECOMMENDATION

requires two factors: first, the person must experience, witness, or be confronted with an event

or events that involved actual or threatened death or serious injury, or a threat to the physical

integrity of the individual or others, and second, the person's response must involve intense fear,

helplessness, or horror. American Psychiatric Ass'n., DIAGNOSTIC AND STATISTICAL MANUAL OF

MENTAL DISORDERS 463-468 (4th ed., text rev., 2000) ("DSM-IV-TR"). To be clinically

diagnosed with PTSD, a patient must exhibit the following symptoms: "numbing of general

responsiveness"; "persistent re-experiencing of the traumatic event"; "persistent avoidance of

stimuli associated with the trauma"; and "persistent symptoms of increased arousal." Id. PTSD

may only be issued as the formal diagnosis if the symptoms cause "clinically significant distress

or impairment" of major domains of daily life, such as occupational activities, social relations, or

other "important areas of functioning," and only if these effects last for over one month. Id.

Symptoms usually present within three months of the traumatizing event, but onset may be

delayed, sometimes for many years. Id. Because petitioner's injury occurred before PTSD was a

recognized clinical diagnosis, and because his injury is by its very nature intangible, the facts in

this case warrant close scrutiny.

### b. PETITIONER'S PTSD

Petitioner alleges his PTSD resulted from the vehicular assault and beating he suffered at

the hands of his commanding officer, Sergeant Webb. In both instances, petitioner suffered

serious bodily injury, causing him to feel intense fear and helplessness. The record shows that on

July 21, 1970, petitioner was treated for contusions to his foot after being run over with a forklift,

consistent with his allegations of Sergeant Webb's first attack. The record also shows that

petitioner has a medical record showing he was treated September 17, 1970, for injuries

Page 19 - REPORT AND RECOMMENDATION

consistent with his allegations of Sergeant' Webb's second attack. While this document is apparently not found in petitioner's military medical file, there is no allegation and no evidence that this document is forged or otherwise fraudulent. The ALJ made no such finding, the respondent does not make that argument here. Dr. Otis, who actually examined the record, did not find it to be false, fraudulent, or otherwise inauthentic. His only conclusion was that while the beating could not be substantiated, if the attack *had* happened that event would be sufficient to satisfy the stressor criteria required for a clinical PTSD diagnosis. Dr. Otis then diagnosed and treated petitioner with PTSD caused by harassment and physical abuse.

Circumstantial evidence supports Dr. Otis's diagnosis and the conclusion that petitioner did in fact suffer this traumatic event. Prior to his assignment to Germany, petitioner's performance ratings were good and excellent, but after the alleged traumatic incident petitioner began receiving negative performance evaluations and was recommended for discharge. In November 29, 1970, Captain Silberg conducted a psychiatric evaluation of petitioner and diagnosed him as suffering from passive-aggressive personality disorder, and petitioner was subsequently discharged. This is consistent with how PTSD was diagnosed prior to 1980 and the official recognition of PTSD in DSM-III as a separate and distinct mental disorder. The record therefore contains evidence that the traumatic event occurred, and that petitioner was diagnosed within two months of the event as suffering from PTSD, albeit under another diagnostic label-- the one commonly used prior to the official recognition of PTSD as a separate psychological injury.

During his treatment of petitioner for diabetes August 12, 1999, NP McDonald noted that petitioner appeared depressed and recommended a psychiatric evaluation. Petitioner was

subsequently diagnosed as suffering from PTSD on four separate occasions, in 2001, 2003, and April and December of 2004, and possibly on a fifth unidentified occasion sometime between 1990 and 2003. The 2001, 2003, and 2004 diagnoses were rendered after extensive testing conducted according to medically acceptable clinical and laboratory diagnostic techniques. Moreover, the clinical tests on which these diagnoses are based produced results that were consistent from 2001 to 2004, as noted by Dr. Otis in his April 2004 diagnosis. NP Suzuki diagnosed petitioner with PTSD of a 20 year duration, and Dr. Otis confirmed this diagnosis in April 2004. Petitioner's records show mental health admissions in 2002 and 2004 for depression, PTSD, psychosis, alcohol dependence, and past cocaine use.

In April 2004, Dr. Otis reported that petitioner presented with PTSD symptoms of intrusive thoughts, nightmares, physical reactivity to reminders of his trauma, avoidance of trauma reminders, decreased interest in activities, a tendency to isolate, restricted range of affect, sleep dysfunction, irritability and problems with concentration, hyper vigilance, and exaggerated startle response. Dr. Otis found petitioner to be credible during his April 2004 and December 2004 examinations, and further found that petitioner's subjective complaints were generally validated by his MMPI-2 profile, elevated clinical scale scores, and low GAF score. Dr. Otis also found that petitioner's symptoms have persisted for many years, that his condition is chronic, and concluded that petitioner's condition is the result of the harassment and physical abuse he believes occurred in 1970 while he was stationed in Germany. Dr. Otis reaffirmed this diagnosis in his December 2004 follow up evaluation. Petitioner continues to receive ongoing care through the VA for his PTSD and has been given a VA disability rating of 70 percent due to his PTSD.

Despite this evidence, the ALJ summarily concluded that petitioner did not have a mental

Page 21 - REPORT AND RECOMMENDATION

impairment because there was no record that petitioner was diagnosed with or treated for PTSD prior to the date last insured. The ALJ reached this conclusion without any explanation or summary of the record, apparently ignoring the diagnoses of petitioner's treating physician Dr. Otis in 2004; NP Suzuki's prior diagnosis in 2001; NP McDonald's observation that petitioner appeared depressed in 1999; Captain Silberg's 1970 psychiatric evaluation and diagnosis and the specific historical context of how PTSD was treated and diagnosed at the time of petitioner's injury; and without addressing petitioner's VA disability rating. On these facts, the ALJ erred in finding that petitioner's PTSD was not a medically determinable impairment.

### c. PETITIONER'S DIABETES MELLITUS

It is undisputed that petitioner's diabetes mellitus is a medically determinable impairment, and that petitioner was diagnosed as suffering from this impairment prior to the expiration of his insured status. The ALJ found so in his decision and the respondent does not contest that finding. The court finds that this conclusion is supported by substantial evidence in the record supports this finding, and therefore need not further address this impairment.

## II. PETITIONER'S PTSD SATISFIES THE THRESHOLD "SEVERE" REQUIREMENT

A "severe" impairment, or combination of impairments, is defined as one that significantly limits physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520, 416.920. Including a severity inquiry at the second stage of the evaluation process allows the Commissioner to efficiently identify and screen out claimants whose impairments are so slight that they are unlikely to be found disabled even when considering the individual's age, education, and experience. Corrao v. Shalala, 20 F.3d 943, 949 (9th Cir. 1994) (citing Yuckert, 482 U.S. at

153).  However, an overly stringent application of the severity requirement would violate the statute by denying benefits to claimants who meet the statutory definition of "disabled."  Corrao, 20 F.3d at 949 (internal citation omitted).  The claimant does not have to prove he is actually disabled at step two of the evaluation process.  Yuckert, 482 U.S. at 146.  Despite use of the term "severe," most circuits, including the Ninth Circuit, have held that "the step-two inquiry is a de minimis screening device to dispose of groundless claims."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996) (*citing* Yuckert, 482 U.S. at 153-54).  An impairment or combination of impairments should be found to be "non-severe" only when the evidence establishes merely a slight abnormality that has no more than a minimal effect on an individual's physical or mental ability to do basic work activities.  Corrao, 20 F.3d at 949 (internal citations omitted); 20 C.F.R. §§ 404.1521(b)(3)-(6), 416.921(b)(3)-(6); SSR 85-28.  In evaluating a claimant with more than one impairment, the Commissioner must consider "whether the combination of those impairments is medically equal to any listed impairment."  Lester, 81 F.3d at 829; 20 C.F.R. § 404.1526(a).  The claimant's impairments must be considered in combination and must not be fragmentized in evaluating their effects.  Lester, 81 F.3d at 829 (internal citations and quotation marks omitted).  In determining whether the claimant's combination of impairments equals a particular listing, the commissioner must consider whether his "symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria."  20 C.F.R. § 404.1529(d)(3).

### a.  PETITIONER'S MENTAL IMPAIRMENTS

In determining whether a claimant with a mental impairment meets a listed impairment, the Commissioner considers: (1) whether specified diagnostic criteria ("paragraph A" criteria) are met; and (2) whether specified functional restrictions are present ("paragraph B and C" criteria).

20 C.F.R. § 404.1520a. The claimant's mental impairment must satisfy both the diagnostic criteria and the functional restrictions to meet the listings. Even if a claimant's mental impairment does not meet the criteria specified in the listings, he must be found disabled if his condition is "equal to" a listed impairment. 20 C.F.R. § 404.1520(d).

Posttraumatic stress disorders are included in Listing 12.06, "Anxiety Disorders." The paragraph A diagnostic criteria for Listing 12.06 include (1) generalized persistent anxiety accompanied by three out of the four of the following signs or symptoms: (a) motor tension, (b) autonomic hyperactivity, (c) apprehensive expectation, and (d) vigilance and scanning; (2) a persistent irrational fear of a specific object, activity, or situation which results in a desire to avoid the dreaded object, activity, or situation; and (5) recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. A claimant who satisfies at least one of the paragraph A diagnostic criteria contained in Listing 12.06 must be found disabled if his condition results in at least two of the paragraph B functional limitations. The paragraph B functional limitations consist of (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration.

Petitioner has also been diagnosed with psychotic disorder, recurrent severe major depressive disorder with psychotic features, and schizotypal personality disorder. Schizophrenic, paranoid and other psychotic disorders are addressed in Listing 12.03. The paragraph A diagnostic criteria for Listing 12.03 include (1) delusions or hallucinations, and (4) emotional withdrawal and/or isolation. A claimant who satisfies one or more of the paragraph A diagnostic

Page 24 - REPORT AND RECOMMENDATION

criteria must be found disabled if his condition results in at least two of the paragraph B

functional limitations, which consist of (1) marked restriction of activities of daily living; (2)

marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining

concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of

extended duration.

The record shows that petitioner has become estranged and alienated from his family,

unable to maintain close intimate relationships, and generally suspicious and incapable of

trusting in others. Over time, petitioner has isolated himself completely and no longer

participates in his church or the fraternal organizations which were once important to him. He is

afraid to leave his home and does so only when necessary. Petitioner has struggled with

joblessness, homelessness, and alcohol and cocaine abuse, all symptomatic of PTSD. Petitioner

also suffers from the following PTSD symptoms: intrusive thoughts, nightmares, physical

reactivity to reminders of his trauma, avoidance of trauma reminders, decreased interest in

activities, a tendency to isolate, restricted range of affect, sleep dysfunction, irritability and

problems with concentration, hyper vigilance, and exaggerated startle response. (Tr. 181, 194-

196). His symptoms have persisted for many years, and as a result he has been diagnosed with

"chronic" PTSD. He received inpatient care for alcohol and drug treatment in 1990, and

depression, PTSD, psychosis, alcohol dependence, and past cocaine use in 2002 and 2004.

On these facts, the court finds that the petitioner has presented sufficient evidence to

satisfy the severity threshold of step two under either Listing 12.03 or Listing 12.06. Therefore,

the ALJ erred by concluding that petitioner's mental impairments would not meet or medically

equal the severity of any mental listing in section 12.00.

Page 25 - REPORT AND RECOMMENDATION

### b. PETITIONER'S DIABETES MELLITUS

Diabetes mellitus is addressed in Listing 9.08.  Finding an impairment requires a diagnosis of diabetes mellitus with (A) neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station; or (B) acidosis occurring at least on the average of once every two months documented by appropriate blood chemical tests (pH or $pCO_2$ or bicarbonate levels); or (C) retinitis proliferans evaluated under the criteria in Listings 2.02, 2.03, or 2.04.  Under Listing 2.02, a claimant has a medically determinable visual acuity loss if the remaining vision in the better eye after best correction is 20/200 or less.

The ALJ concluded that petitioner's diabetes was not severe prior to the date last insured, stating "it is apparent that [petitioner's] diabetes was well controlled through oral medication" prior to the date last insured, and "[t]here was no documented evidence of negative effects on the claimant that could have been attributed to the diabetes." (Tr. 16).  This finding is clearly contradicted by the record.

The record shows that as early as 1970, petitioner's glucose tests were consistent with a precursor of diabetes.  However, he was not diagnosed with diabetes until 1990.  The record does not contain his original diagnosis, nor any of his medical records from 1990 through May of 1999.  However, the record does show that in mid-June of 1999, petitioner presented with diabetes that was "out of control."  Despite prescriptions for Tolinase, Glucophage, and Rezulin, his blood sugar remained consistently in the 200s and regularly fluctuated into the 300 to 400 levels throughout for the next six months.  Petitioner's treating doctor concluded his diabetes was "not well controlled" by the oral medications, and petitioner was switched to insulin in December

Page 26 - REPORT AND RECOMMENDATION

of 1999 precisely because his diabetes could *not* be controlled through these oral medications.
Despite the use of insulin, petitioner continued to receive treatment for "poorly controlled
diabetes" through 2005 and 2006.

Throughout this period of time petitioner had constant, recurring complaints of loss of
depth perception and dizziness, which his treating doctors have consistently attributed to his
diabetes and, in particular, his uncontrolled blood sugar fluctuations.  Because of these vision
problems, petitioner's doctors placed restrictions on his working activities in January of 2000 and
again in June of 2000, and went so far as to recommend a change in occupations.  His VA
records reflect diagnoses of unspecified visual loss, unspecified retinal disorder, blindness in one
eye and low vision in the other, diabetic retinopathy, diabetic neuropathies in his feet,
hypertension, hyperlipidemia, and atherosclerotic vascular disease, and describe petitioner's
diabetes as life altering and sight threatening.

### c.  CONCLUSION

In light of the evidence as stated above, petitioner has proved that he suffers from more
than a slight mental impairment and physical impairment.  Regardless of whether this evidence is
ultimately sufficient to prove that petitioner is disabled within the meaning of the Act, it is
sufficient to satisfy the "threshold element" of a "severe" impairment at step two of the sequential
evaluation.

## B.  THE MULTIPLE IMPAIRMENTS ANALYSIS

Petitioner argues that the ALJ erred by failing to consider the combined effect of all
petitioner's alleged impairments (diabetes mellitus, PTSD, depression, history of alcohol and
cocaine dependency, and schizotypal personality disorder), and whether these impairments either

singularly or combined resulted in more than a minimal limitation.

A multiple impairments analysis is required when the claimant has proven that he or she actually suffers from more than one valid impairment. *See* <u>Macri v. Chater</u>, 93 F.3d 540, 545 (9th Cir. 1996). Conditions contained in the "Listing of Impairments" are considered so severe that they are presumed disabling. <u>Lester</u>, 81 F.3d at 828 (*citing* 20 C.F.R. § 404.1520(d)). An ALJ is "required to take into account the combined effect of a claimant's physical and mental impairments in determining whether his condition equals" those in the Listings. <u>Id.</u> at 825. In doing this, the ALJ is required to adequately explain the evaluation of alternative tests and the combined effects of the impairments alleged to equal a Listing. *See* <u>Marcia v. Sullivan</u>, 900 F.2d 172, 176 (9th Cir. 1990). The ALJ is not required to state why a claimant fails to satisfy every section of the Listings, as long as the ALJ adequately summarizes and evaluates the evidence. <u>Gonzalez v. Sullivan</u>, 914 F.2d 1197, 1200-01 (9th Cir 1990); *see also* 20 C.F.R. § 404.1526 (the ALJ must "review the symptoms, signs, and laboratory findings"). Claimants are conclusively disabled if their condition either meets or equals a listed impairment. <u>Lester</u>, 81 F.3d at 825.

To the extent that the ALJ summarizes the medical evidence regarding petitioner's physical and mental impairments, the summary is so fundamentally flawed as to render it entirely unreliable. The summary states conclusions regarding petitioner's diabetes that are directly and explicitly contradicted by petitioner's medical records from 1999, and after listing petitioner's many PTSD symptoms simply concludes without explanation that these symptoms did not become severe until after the date last insured. The decision never mentions nor discusses NP Suzuki's diagnosis or Dr. Otis's two subsequent diagnoses confirming her conclusion that petitioner's PTSD resulted from events occurring in 1970. Moreover, the ALJ fails to address the

fact that, in addition to PTSD, petitioner has also been diagnosed with schizotypal personality disorder and recurrent severe major depressive disorder with psychotic features. Accordingly, the ALJ made no attempt to consider how petitioners various ailments cumulatively affect him, and whether that constellation of syndromes and symptoms would satisfy any of the listings set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1. Thus the ALJ's evaluation of petitioner's impairments is incomplete, an omission which constitutes error.

## C.  THE ALJ ERRED BY FAILING TO DETERMINE THE DATE OF ONSET OF PETITIONER'S DISABILITY

Petitioner argues that the ALJ's duty to consult a medical expert to determine the date of onset of his PTSD was triggered by Dr. Otis's April 2004 report, in which he diagnosed petitioner with chronic PTSD as a result of trauma related stress occurring in 1970, and noted that the 2004 diagnostic test results were consistent with petitioner's 2001 test results.

Only disabilities existing before the date last insured establish entitlement to disability benefits. Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (*citing* Vincent v. Heckler, 739 F.2d 1393, 1394 (9th Cir. 1984)). However, the critical date for disability compensation is the date of onset of the disability, not the date of diagnosis. *See* Morgan v. Sullivan, 945 F.2d 1079, 1081 (9th Cir. 1991); Swanson v. Sec. of Health & Human Servs., 763 F.2d 1061, 1065 (9th Cir. 1985); SSR 83-20. In the Ninth Circuit, the ALJ has an affirmative duty to "fully and fairly develop the record and to assure that the claimant's interests are considered." Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (*citing* Armstrong v. Comm'r of Soc. Sec. Admin., 160 F.3d 587, (9th Cir. 1998)); 42 U.S.C. § 423(d)(5)(b); 20 C.F.R. § 404.1512(d)-(e).

The ALJ's duty is triggered where the evidence is ambiguous, or by the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence. Tonapetyan, 242

Page 29 - REPORT AND RECOMMENDATION

F.3d at 1150. "The ALJ may discharge this duty in one of several ways, including:  subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow for supplementation of the record." Id.; *see also* Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.").  This duty exists even when the claimant is represented by counsel. Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) (*citing* Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)).  The ALJ's duty is heightened where the claimant may be mentally ill. Tonapetyan, 242 F.3d at 1150.  Failure to sufficiently develop the record constitutes grounds for remand. Id. at 1151.

Respondent argues that the ALJ was not required to call a medical expert to determine the onset date of petitioner's PTSD because he found that even the limitations petitioner developed after the date last insured would not support a finding of disability.  Respondent relies on Sam v. Astrue, 550 F.3d 808 (9th Cir. 2008) in support of this argument.  In Sam, the Ninth Circuit held that the ALJ was not required to consult a medical expert for assistance with inferring an onset date of disability where the ALJ explicitly found that the claimant was not disabled at any time, and that finding was supported by substantial evidence. Id. at 810-811.  In so holding, the Ninth Circuit held that an ALJ's duty to determine the date of onset may occur in one of two situations: first, where the ALJ makes an explicit finding of disability, or second, where the record contains substantial evidence that the claimant was disabled at some point after the date last insured but is

Page 30 - REPORT AND RECOMMENDATION

unclear as to the date of onset. Id. at 811.

While the ALJ found that petitioner was never disabled, that determination is, as discussed above, not supported by substantial evidence. In fact, the record affirmatively shows that petitioner has two medically determinable impairments: diabetes mellitus and PTSD. However, inconsistencies and ambiguities in the record preclude a finding as to when petitioner's impairments became disabling, if, in fact, they did. Specifically, while it is clear that petitioner currently suffers from both diabetic retinopathy and diabetic neuropathy, it is unclear when he was diagnosed with these conditions. There is clear evidence of vision problems attributed to his diabetes dating back to 1999 and reports of unspecified functional visual loss in 2000, followed by references to partial blindness and retinopathy in 2001, functional visual loss in 2001 and again in 2002, and a "history" of diagnosed retinopathy in 2004. What is unclear is at what point his vision problems became severe enough to satisfy the requirements of Listing 9.08.

It is also unclear whether petitioner's PTSD is disabling, and if so, when that occurred. This case is therefore more like Tonapetyan and Armstrong than Sam. In Tonapetyan, the reviewing court concluded that where the non-examining psychological expert testified that the evidence from the claimant's treating psychiatrist was "confusing," recommended that a more detailed opinion be secured, and opined that whether the record was sufficient for the ALJ to reach a conclusion was "difficult to say," the ALJ erred in not making further inquiry. Tonapetyan, 242 F.3d at 1150-51. Here, the non-examining psychological consultants employed by the Commissioner concluded without explanation that the record was insufficient to assess petitioner's psychological functioning prior to the date last insured. In contrast, in 2004 Dr. Otis twice diagnosed petitioner with "chronic" PTSD related to events occurring in 1970, and

referenced Captain Silberg's 1970 psychiatric evaluation and diagnosis of petitioner in a manner
consistent with the diagnosis of PTSD at that time, before PTSD was a clinically recognized
diagnosis.  Dr. Otis also recorded clinical test results in 2004 that were "essentially identical" to
those obtained in 2001, supporting the inference that petitioner's condition remained unchanged
for that period of time.  Dr. Otis also references NP Suzuki's prior diagnosis of petitioner as
suffering from PTSD of a 20-year duration, in a context that makes clear her diagnosis occurred
sometime between 1990 and 2003 but which fails to affirmatively identify her as the
administrator of the 2001 test, or otherwise specifically identify the date of her diagnosis.  Thus
in this case, as in Tonapetyan, the information from petitioner's treating psychiatrist Dr. Otis
provides strong evidence of PTSD predating the date last insured, but with some clarification and
more detail should provide an adequate basis to support a determination of petitioner's disability.

In that way, this case is comparable to Armstrong.  There, the court found that the record
showed the claimant had experienced depression for many years prior to the date last insured, but
included insufficient evidence from which the date of disability could be determined.
Armstrong, 160 F.3d at 590.  While the claimant's multiple mental disorders were not diagnosed
until 1994, the court found that the claimant's impairments could have been disabling long before
the date of diagnosis due to his deteriorating physical health and failing mental health as well.
Id.  Although the claimant had not sought treatment or been diagnosed prior to 1994, the court
found sufficient evidence to support an inference of the claimant's failing mental health where
after his wife of 26 years left him, the claimant turned his business over to his children, began
living out of his truck, recycled aluminum cans to survive, and suffered from depression
evidenced by crying spells and alcohol addiction.  Id.  The Ninth Circuit held that while the

Page 32 - REPORT AND RECOMMENDATION

claimant was not relieved of his burden of proving that he was disabled before his disability insured status expired, SSR 83-20 required the ALJ to call a medical expert to create a record that would provide a basis for determining the disability onset date from the existing evidence. Id.

In this case, petitioner's PTSD allegedly results from traumatic events occurring in 1970. Little is known about the period immediately following his discharge other than that his first marriage failed and he did not have stable employment. His situation appeared to improve in 1978 when he was hired on at Whitney Research, and with this stable employment appeared to function normally for some period of time, even marrying for a second time and fathering a child. However, in 1981 he was hospitalized for cut tendons in his hands. Sometime between 1976 and 1983, he was hospitalized for surgery to reattach a detached retina. His second marriage ended in divorce in 1983. From 1984 to 1997, his employment was unstable, he suffered from homelessness, alcohol addiction and cocaine addiction, and began to struggle with PTSD symptoms. In 1990, petitioner went through an alcohol treatment program provided through a Homeless Veterans Program at Menlo Park VAMC, and was diagnosed with diabetes. The only medical records available for this period of time show that petitioner presented with out of control diabetes in 1999, which remained poorly controlled despite oral medications and insulin, with associated and chronic vision problems which interfered with his ability to work beginning June of 1999, work restrictions imposed by his doctor in 2000, and ultimately resulted in blindness. Petitioner reports episodic depression dating back to at least 1990 and increased anxiety caused by his deteriorating physical condition due to his diabetes. Petitioner's medical providers noted the effect of his deteriorating physical health on his mental health as early as

Page 33 - REPORT AND RECOMMENDATION

August 1999, through to the present date. His medical records note mental health admissions in both 2002 and 2004 for depression, PTSD, psychosis, alcohol dependence, and past cocaine use. By April 2004, petitioner's physical impairments included diabetic retinopathy, diabetic neuropathies in his feet, hypertension, hyperlipidemia, and atherosclerotic vascular disease. Dr. Allen, petitioner's treating physician since July 2004, issued a letter in April 2007 stating that, in his medical opinion, petitioner is completely disabled.

On these facts, it is apparent that petitioner was disabled at some point after the expiration of his insured status, but it is unclear when petitioner's mental and physical impairments, either alone or cumulatively, became disabling. Therefore, the ALJ was required to consult a medical expert to determine the date of onset of petitioner's PTSD, and whether and when his PTSD, either alone or in conjunction with his other diagnosed mental and physical impairments, became disabling. On remand, the ALJ shall assist petitioner with creating a complete record. The ALJ may fulfill this duty by calling a medical expert; exploring lay evidence including any testimony or affidavits submitted by petitioner's family, friends, and former employers; and considering any retrospective diagnosis offered by petitioner's treating physicians. *See* Flaten v. Sec. Health & Human Servs., 44 F.3d 1453 (9th Cir. 1995) (retrospective diagnosis recognized in the Ninth Circuit); *see also* Likes v. Callahan, 112 F.3d 189 (5th Cir. 1997) (addressing retrospective diagnosis for a PTSD claimant).

## IV.  REJECTING TREATING PHYSICIAN'S OPINION

Petitioner argues the ALJ committed reversible error by improperly crediting the opinions of three non-examining physicians, Drs. Mary Ann Westfall, Paul Rethinger, and Frank Lahman, over the opinion of petitioner's treating physician, Dr. William Allen.

Page 34 - REPORT AND RECOMMENDATION

In the face of conflicting medical evidence, the ALJ must determine credibility and resolve the conflict. Thomas v. Barnhart, 278 F.3d 947, 956-57 (9th Cir. 2002). Courts distinguish the physicians who might be called upon to assess a claimant's disability by categorizing them into three types: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." Lester, 81 F.3d at 830. As a general rule, courts weigh the opinions of physicians according to the significance of their clinical relationship with the claimant. Carmickle v. Comm'r Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008). To reject the opinion of a controverted treating physician, an ALJ must set forth specific and legitimate reasons supported by substantial evidence in the record. Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003). An ALJ may satisfy the standard by noting the presence of conflicting medical opinions in the record which are themselves based on independent clinical findings. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). "An ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings." Batson v. Comm'r of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (internal citations omitted); see also SSR 96-6p, available at 1996 WL 374180, at *1 (July 2, 1996) (a medical opinion offered in support of an impairment must include "symptoms [and a] diagnosis."). An ALJ must consider all relevant evidence in an individual's case record, including opinions from sources other than "acceptable medical sources," like a nurse practitioner. 20 C.F.R. § 416.913(d)(1), SSR 06-03p. The ALJ must give specific and "germane" reasoning for rejecting these opinions. Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996) (citing Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).

Dr. Allen's opinion letter is exceptionally brief, stating only that in his opinion petitioner is totally disabled and that this disability is not the result of drug or alcohol use.  The record shows that between July 14, 2004, and July 10, 2006, Dr. Allen treated petitioner for diabetes and related complications, PTSD, hypertension, hyperlipidemia, peripheral nerve disease, peripheral vascular disease, vertigo, chronic diabetic ulcers, and episodic cocaine use.  Thus Dr. Allen is, indisputably, a treating physician.  While the record generally supports his conclusion that petitioner is disabled, his letter does not specify the basis for his diagnosis or the date on which Dr. Allen believes petitioner became disabled.

Dr. Westfall, Dr. Rethinger, and Dr. Lahman, on the other hand, are agency medical consultants.  Dr. Westfall is apparently a medical doctor, while Drs. Rethinger and Lahman appear to be clinical psychologists.  Dr. Westfall's determination, dated August 3, 2006, merely concludes "insufficient evidence to assess physical function prior to DLI."  (Tr. 317).  Dr. Rethinger's determination, dated August 4, 2006, likewise concludes "insufficient evidence to assess psych function prior to DLI."  (Tr. 330).  Neither of these opinions describes or summarizes the medical records which were reviewed.  Dr. Lahman's determination, dated December 20, 2006, again concluded there was insufficient evidence to assess petitioner's PTSD prior to the date last insured.  (Tr. 469).  In so finding, Dr. Lahman indicates that he considered only the time period between October 1, 2000, and December 31, 2000, and notes "[r]eview of the MEOR in file notes that it doesn't even start until 7-01 and then there is a wide gap and starting again in 7-06.  This is insufficient evidence."  Thus it appears that Dr. Lahman, like the ALJ, considered only a three month period of time, either ignoring or unaware of petitioner's allegation that his PTSD existed long before this timeframe.  Neither Dr. Lahman nor Dr.

Page 36 - REPORT AND RECOMMENDATION

Rethinger identifies whether he reviewed petitioner's 1970, 2001, and 2004 diagnoses, or whether he disagrees with the retrospective diagnoses offered by NP Suzuki and Dr. Otis.

The ALJ's decision does not so much as mention Dr. Westfall, Dr. Rethinger, Dr. Lahman, or Dr. Allen, either by name or by reference to their respective letters. Furthermore, the ALJ does not mention Dr. Otis, either by name or by reference to his 2004 diagnoses, the extensive testing he conducted, or his conclusion that petitioner's PTSD resulted from traumatic events occurring in 1970. Therefore the court is unable to determine what weight, if any, the ALJ accorded their respective findings in reaching his conclusions. This is legal error. On remand, the ALJ is directed to provide specific and legitimate reasons supported by substantial evidence in the record for rejecting the opinions of Dr. Allen and Dr. Otis.

## V. CREDIBILITY

As discussed above, petitioner has provided objective medical evidence that he suffers from both diabetes mellitus with related functional visual loss, and PTSD with associated functional limitations. In his application for disability benefits, he alleged that the onset of these symptoms occurred in the 1990s. Dr. Otis's 2004 diagnoses reflect that petitioner's symptoms had persisted for "many years" and his PTSD was "chronic." At the hearing, petitioner testified his vision was "almost gone" in his left eye in 2000, that he suffered from neuropathy in 2000 as well, and that he suffered from PTSD symptoms including sleep deprivation, auditory hallucinations, flashbacks, anxiety, social isolation, and a profound inability to trust in others.

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). However, once a claimant presents the ALJ with "objective medical evidence of an underlying

Page 37 - REPORT AND RECOMMENDATION

impairment which could reasonably be expected to produce the pain or other symptoms alleged," the ALJ may only reject the claimant's credibility based on evidence of malingering or other clear and convincing reasons. Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007); *see also* Lingenfelter v. Astrue, 504 F.3d 1028, 1036-40 (9th Cir. 2007). General findings are insufficient. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). It is not enough to simply say that petitioner's symptoms are subjective. *See* Orn, 495 F.3d at 635; Lingenfelter, 504 F.3d at 1036-37. "While an ALJ may find testimony not credible in part or in whole, he or she may not disregard it solely because it is not substantiated affirmatively by objective medical evidence." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) (internal citations omitted). If there is substantial evidence in the record to support the ALJ's credibility finding, the court will not engage in second-guessing. Thomas, 278 F.3d at 959.

The ALJ did not inquire of petitioner as to the onset date of these symptoms or otherwise question his credibility at the hearing, which from the transcript appears to have been brief to the point of perfunctory. Nowhere in his opinion does the ALJ make any specific findings regarding petitioner's credibility. The ALJ simply concludes that the petitioner's allegations are not supported by objective medical evidence. It is impossible to tell from this statement what portions of petitioner's testimony he did or did not credit, and what parts of petitioner's testimony and the record evidence were contradicted by what clinical observations. This is legal error. On remand, if the ALJ finds petitioner's subjective testimony is not credible, the ALJ is directed to provide clear, cogent, and convincing reasons for rejecting petitioner's credibility.

## VI. VETERANS ADMINISTRATION DISABILITY DETERMINATION

Petitioner provided testimonial evidence that he has received a VA disability rating of 70

percent due to service related PTSD.

An ALJ must ordinarily give great weight to a Veterans Administration determination of disability. <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076 (9th Cir. 2002). Such deference is justified because of the "marked similarity" between the purposes and evaluation procedures employed by both the Social Security and VA federal disability programs. <u>Id.</u> If an ALJ chooses to give less weight to a VA determination, he must provide evidence that he adequately considered the VA's rating, such as by explicitly mentioning that rating in his opinion, and give "persuasive, specific, valid reasons for doing so that are supported by the record." <u>Id.</u> Failure to do so constitutes grounds for reversal. <u>Id.</u>

The ALJ concluded that even if petitioner developed and suffered from all of the symptoms he alleges, this would be insufficient to establish either mental disability due to PTSD or physical disability due to diabetes. Nowhere in his decision does the ALJ so much as mention petitioner's 70 percent VA disability rating due to his PTSD. His failure to provide evidence that he adequately considered the VA's disability rating in reaching this conclusion constitutes grounds for reversal. On remand, the ALJ is directed to properly address the VA disability rating as required under <u>McCartey</u>.

## **RECOMMENDATION**

Based on the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g), it is recommended that the Commissioner's decision be reversed and the matter remanded for further administrative proceedings, and that judgment be entered accordingly.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate

Page 39 - REPORT AND RECOMMENDATION

Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due by November 15, 2010. If objections are filed, any response to the objections are due by December 2, 2010. See* Federal Rules of Civil Procedure 72, 6.

DATED this 26 day of October, 2010.

_____
MARK D. CLARKE
United States Magistrate Judge

Page 40 - REPORT AND RECOMMENDATION